GLENN (STUDER v.). See Case No. 13,558.

## Case No. 5,481.

GLENN et al. v. UNITED STATES.

[Hempst. 394.] [1]

District Court, D. Arkansas. April, 1849.[2]

LAND GRANTS—SPANISH CLAIMS.

Spanish claim rejected (1) because conditions not complied with, and (2) because there was no survey of the grant.

*In Supreme Court.*

1. In 1796, when Delassus was commandant of the post of New Madrid, he exercised the powers of sub-delegate, and had authority, under the instructions of the governor-general of Louisiana, to make conditional grants of land. He made a grant to Clamorgan, who stipulated on his part to introduce a colony from Canada to cultivate hemp and make cordage for the use of the king's vessels; but these conditions the grantee failed to perform. By the Spanish laws and ordinances, these conditions had to be performed before the grantee could obtain a perfect title. If the Spanish governor would have refused to complete the title, this

[1] [Reported by Samuel H. Hempstead, Esq.]
[2] [Affirmed in 13 How. (54 U. S.) 250.]

court, acting under the laws of congress, must likewise refuse.

2. After the cession of Louisiana to the United States in 1803, Clamorgan could not legally take any step to fulfil the conditions; and the case must be judged of as it stood the 3d March, 1804.

3. The difference between this and Arredondo's Case. 6 Pet. [31 U. S.] 706, explained. The Cases of Arredondo, Id. 691; Soulard, 10 Pet. [35 U. S.] 100; Wiggins, 14 Pet. [39 U. S.] 334; Menard v. Massey, 8 How. [49 U. S.] 293; and Boisdoré, 11 How. [52 U. S.] 63, cited and approved.

Petition [by John Glenn and Charles M. Thurston, claiming under Jacques Clamorgan], under act of 17th June, 1844 [5 Stat. 676], for the confirmation of a Spanish claim.

Albert Pike and D. J. Baldwin, for petitioners.

S. H. Hempstead, Dist. Atty., for the United States.

JOHNSON, District Judge. In this case, I do not deem it necessary to give reasons at length for the decree I shall render, because the decision must depend mainly on principles already decided in Winter v. U. S. [Case No. 17,895], and in De Villemont v. U. S. [Id. 3,839]. It is true that this is in some respects different; but that difference is rather formal than substantial. I deem the claim invalid upon two grounds: First, that the conditions of the grant were not complied with; and I will merely remark that I cannot subscribe to the argument that it was a grant without conditions; second, that there was no authoritative survey of the grant, which was undoubtedly required by the Spanish regulations. For my reasons on this point, I refer to the opinion in the case of Winter v. U. S. [supra]. Nor do I deem the calls of the grant sufficiently certain to separate any land from the royal domain without a survey.[3] On these two grounds, the claim must be rejected. Decreed accordingly.

NOTE. From this decree the petitioners appealed to the supreme court; and at the December term, 1851, the case was argued there by Mr. Webster and Mr. Johnson for the appellants, and Mr. Crittenden, Atty. Gen., for the United States. It is reported in 13 How. [54 U. S.] 250.

Catron, Circuit Justice, delivered the following opinion:

In August, 1796, James Clamorgan petitioned Colonel Delassus, then acting as commandant of the post and dependency of New Madrid, for a grant of land fronting on the Mississippi river for many miles, and running back to the western branches of White river, including a section of country equal in area to 536,904 arpens, as was afterwards ascertained by measurement. To obtain title and possession of this large quantity of land, Clamorgan represented that he was a merchant residing in St. Louis; that he had been strongly encouraged by the governor-general of the province of Louisiana to establish a manufactory of cordage, fit and proper for the use of his Spanish

---

[3] The supreme court, it will be seen, overruled this point, holding that the grant was sufficiently described to fix its locality.

majesty's vessels, and especially for the necessities of the Havana, to which place his excellency desired the petitioner to export the cordage, under his (the governor-general's) protection; of which facts the commandant was advised, so that he might exercise his power to favor an enterprise likely to become very important to the prosperity of the dependency, and very lucrative to all the inhabitants of Upper Louisiana. Furthermore, that the petitioner (Clamorgan) was then connected in correspondence and interest with a powerful house in Canada, which might procure for him a sufficient number of cultivators to teach in that region the manner of cultivating hemp, and fabricating it into various kinds of cordage, in the most perfect manner, so as thereby to respond to the views of the general government, which desired the prosecution of this enterprise by all proper and honest means that possibly could be used to exempt his majesty from drawing in future from foreigners this article, so important in the equipment of his vessels.

Clamorgan further stated that "it is with this hope that the petitioner has actively made the most pressing demands to obtain from his correspondents in Montreal a considerable number of people proper for this culture, who must of necessity by inducement be attracted hither, although at this moment the political circumstances of Canada appear to oppose it, but in more favorable times hereafter, this object may undoubtedly be obtained. Notwithstanding which, the petitioner is obliged to assure himself in advance from you, monsieur, a title which may guarantee to him the proprietorship of a quantity or arable land proportioned to his views, in order to form an extensive establishment as soon as the time shall appear favorable to his enterprise, and as soon as his correspondents shall be able, without compromitting their sense of duty, to cause to emigrate to this country the number of people necessary to give birth to this culture, so much desired by the government. Considering, monsieur, this expectation of the petitioner, and the particular recommendations of his excellency, the governor-general of the province, the petitioner hopes that you will be pleased to grant him the quantity of land which he desires to obtain, as well in order to favor him, the execution of all which may contribute to the future success of his project, as to furnish him the means of attracting hereafter from a foreign country an emigration of cultivators, which may not perhaps be obtained until after a considerable lapse of time, and upon promises of rewards which the petitioner will be obliged to fulfil in their favor." The land solicited is then described; the petitioner proceeds to set forth the title he desires: "To the end that as soon as it may be in the power of the petitioner he may be able to establish and select, in the tract of land so demanded, those portions which shall be best fitted to improve for the culture of hemp; because, inasmuch as a great tract of said lands is now drowned in swamps and unimprovable lowland, making it impossible to fix establishments in the whole extent; all to be done that the petitioner may enjoy the land, and dispose of it always, as a property belonging to him, his heirs, or assigns; and also may distribute them, or part of them, if he thinks fit, in favor of such person or persons as he may judge proper, to attain, as far as on him depends, the accomplishment of his project; and the petitioner will never cease to return thanks for your favors."

To this demand of Clamorgan, the commandant responded, and proceeded to grant as follows: "Since, by the exposition contained in this petition, the means of the petitioner are apparent to me, and his new connection with the house of Todd, which will be able to facilitate to him the accomplishment of the enterprise proposed, the profit whereof, if it succeed, will redound in part to the advantage of this

remote country, miserable on account of its small population; and I giving particular attention to the recommendations which Señor El Baron de Carondelet, governor-general of these provinces, has communicated to me when he thought fit to appoint me commandant of this post and its dependencies, 'to seek by all means the mode of increasing the population and of encouraging agriculture in all its branches, and particularly the cultivation of hemp,' it appearing to me that the propositions which the petitioner makes are conducive to the attainment of this last recommendation. In virtue of this I concede to him and his heirs the tract of land which he solicits, in the place and with the boundaries that he prays for, provided there is injury to no one; and so that the same may be established, he shall cause a survey to be made, not obliging him to accomplish this immediately, as from the excessive extent of space it would cause him great expense if it were done before the arrival of the families which he is bound to cause to come from Canada, but so that, on their arrival and being put in possession, it shall be his duty to secure his property by means of exercising the power of survey, in order afterwards that he may make application to the governor-general to obtain his approval, with the title in form of this his concession." By various conveyances the foregoing claim was vested in Glenn and Thurston, who filed their petition in the district court of Arkansas, seeking to have it confirmed according to the act of 1844. They set forth Clamorgan's application, the commandant's decree thereon, and the mesne conveyances. The attorney of the United States answered, and among other grounds of defence set up, alleged that he was totally uninformed as to the several statements and allegations contained in the petition; that he denied said statements and allegations, and required full proof thereof, as well as of all other matters and things necessary or material to establish the validity of the claim of said James Clamorgan. On these issues the parties went to trial.

The petitioners established by proof that Clamorgan's application and the governor's decree thereon were genuine, and also proved a due execution of the several conveyances vesting title in Glenn and Thurston. No other evidence was introduced by either side. The district court dismissed the petition; and from that decree an appeal was prosecuted to this court. No controversy has been raised drawing in question the validity of the mesne conveyances; nor do we suppose there is any difficulty in locating the land demanded in Clamorgan's petition. Prima facie, its locality is sufficiently described to authorize a survey thereof, according to the Spanish usages. As regards the commandant's power to make the concession to Clamorgan, there is more difficulty. In 1796, when Delassus was commandant at the post of New Madrid, he also acted as sub-delegate, and exercised the faculty of granting concessions for, and ordering surveys of, land. In the exercise of his functions, he was directly subordinate to the governor-general at New Orleans, and acted according to his instructions. Nor was he in any degree dependent on the lieutenant-governor of Upper Louisiana, residing at St. Louis, as appears by letter of August 26, 1799, from Morales to Delassus, reciting the facts. The letter is found in document 12, Senate Documents, 2d Sess. 21st Cong. (page 29), and filed as evidence by Judge Peck, preparatory to his trial before the senate of the United States. In a deposition of Delassus, forming part of the documents filed before the board of commissioners for Missouri in 1833, and afterwards returned by them for the consideration of congress. Delassus states the fact that he, as commandant at New Madrid, exercised the powers of sub-delegate. Document No. 59, p. 17, House Reports, 1st Sess. 24th Cong. This commandant's

powers were therefore coextensive with those of the lieutenant-governor at St. Louis, in distributing the public domain. Having acted under the governor-general, to whose orders and instructions the commandant was bound to conform, it becomes necessary to ascertain what these instructions were in the present instance; and taking the facts stated in Clamorgan's memorial and in Delassus' decree thereon to be true, as we are compelled to do, it is sufficiently manifest, as we think, that the commandant did stipulate with Clamorgan, in accordance with the governor-general's instructions. That the governor-general had power thus to contract, was held by this court when the agreements of Maison Rouge and Bastrop were before it for adjudication; and having done the same through his deputy in this instance, the acts of that deputy cannot be called in question on the assumption that he exceeded his powers. In the document No. 59, above referred to, Delassus states what his practice was in giving out concessions. He kept no books in which the fact was recorded. All he did was to indorse his decree on the petition and return it to the party demanding the land, and the party might hand it to the surveyor or retain it at his option. That he (Delassus) believed the surveyor made a note of the concession of record, but whether before or after the survey was made, he knew not, as that matter did not concern the deponent. That no time was limited within which the party was bound to survey. Thus it appears that Clamorgan got the paper title relied on in the ordinary form, and which he retained in his own hands until after Upper Louisiana was delivered to the United States in March, 1804. No possession was taken of the land, or any part of it; nor was it surveyed during the time Spain governed the country; nor has any claimant under Clamorgan ever had possession, so far as this record shows.

The surveys produced to us are private ones, and of no value in support of the claim. And this brings us to the consideration of the mere title paper, standing alone. On its true meaning this controversy depends. (1) The petition of Clamorgan, and Delassus' decree on it, must be construed together, there being a proposition to do certain acts on the one side, and an acceptance on the other, limited by several restrictions. (2) What is stated in either paper, as to facts or intent, must be taken as true. Such are the rules laid down in Boisdoré's Case, 11 How. [52 U. S.] 87, and which apply here. The country was vacant, and greatly needed population, which could only be drawn from abroad; and this population Clamorgan stipulated that he would supply, and establish a colony from Canada on the land. That he would introduce cultivators of hemp, and artisans skilled in the manufacture of cordage, and would grow hemp and make cordage to an extent so large as to be of national consequence. On the faith of these promises the grant was made. As already stated, no step was taken by Clamorgan to perform the contract; all that he did was a presentation of his petition, and the obtaining of Delassus's approval and decree on it. This paper he retained about thirteen years, when it was assigned to Pierre Choteau May 2, 1809, by a deed of conveyance for the land claimed. In view of these facts, several legal considerations arise. It was held in Arredondo's Case, 6 Pet. [31 U. S.] 711, that by consenting to be sued, the United States had submitted to judicial action, and considered the suit as of a purely judicial character, which the courts were bound to decide as between man and man litigating the same subject-matter; and that, in thus deciding, the courts were restricted within the limits and governed by the rules congress had prescribed. The principal rules applicable here are, that in settling the question of validity of title, we are required by the

act of 1824 [4 Stat. 30] to proceed in conformity with the principles of justice, according to the law of nations, the stipulations of the treaty by which the country was acquired, and the proceedings under the same; the several acts of congress in relation thereto, and the laws and ordinances of the government from which the claim is alleged to have been derived.

When deciding according to the law of nations, and the stipulations of the treaty, we are bound to hold that such title as Clamorgan had by this concession or first decree stood secured to him as private property; and that the claim being assignable, the complainants represent Clamorgan. And this brings us to the question as to what right was acquired by the concession, according to the laws and ordinances of the Spanish colonial government existing and in force when the grant was made. By these the commandant, Delassus, had authority to contract and give concessions, and make orders of survey, by first decrees, either with or without conditions, as this court held in the case of Soulard v. U. S., 10 Pet. [35 U. S.] 144, provided the concession was founded on a consideration prima facie good; either past when the concession was made, or to follow in future. Here the consideration was to arise by future performance on the part of the grantee. But it is insisted, forasmuch as a title vested in Clamorgan by the grant to him, even admitting it was encumbered with conditions, still as their performance was to happen subsequent to the vesting of the estate, the want of performance could only be taken advantage of by a proceeding instituted by government for that especial purpose; nor could want of performance be set up as a defence in this suit. If the premises assumed were true, the conclusion would necessarily follow; and Arredondo's Case [supra], is relied on in support of this position, and as governing the present case. That proceeding was founded on a perfect title, having every sanction the Spanish government could confer. It was brought before the courts according to the 6th section of the act of May 23, 1828 [4 Stat. 285], which embraced perfect titles, and was only applicable to suits in Florida. The subsequent condition there relied on to annul the grant was rendered immaterial, and perhaps impossible, by the grantor himself, as this court held, and the grantee discharged from its performance. But in Clamorgan's case, the conditions to occupy and cultivate were precedent conditions; they addressed themselves to the governor-general, and their performance was required in advance. Before any right existed in Clamorgan to apply for a complete title, or even to have a public survey, preparatory to such application, he was bound by his contract to establish his colony on the land, and furthermore to set up his manufactory to make cordage, and to supply it with hemp grown on the land, unless these conditions were waived on the part of the Spanish government. And as we are called on by the complainants to adjudge the validity of this claim, and to order that a patent shall issue for the land in the name of the United States, it necessarily follows the same duty is imposed on us that would have devolved on the governor-general, had the Spanish government continued in Louisiana. By the Spanish regulations, Clamorgan was not recognized as owner of a legal title without the further act of the king's deputy, the governor-general, or the intendant-general, after the power to make perfect grants was conferred on him. Until this was done, the legal title remained in the crown; and the same rule has been applied in this country. No standing can be allowed to imperfect and unrecognized claims in the ordinary judicial tribunals until confirmed either by congress directly, or by a special tribunal constituted by congress for that purpose. For our opinion more at large on this subject, we refer to the case of Menard v. Massey, 8 How. [49

U. S.] 305–307. As we are asked to decree the final title, and bound to do so, in like manner as the Spanish governor-general or intendant was bound, it follows we may refuse for the same legal reasons that they may refuse. And the question presented is, whether we are bound to refuse, according to the face of the contract sued on, and in conformity to our previous decisions in other cases depending on similar principles?

Very many applications made for perfect titles to the district courts, under the act of 1824, have been resisted, because subsequent conditions had not been complied with; first, such as mill grants in Florida, where the usual quantity of 16,000 acres was given by concession, with a condition that the mill should be built within a specified time; second, where grants were made for the purpose of cultivation, and no cultivation followed, as in the Cases of Wiggins, 14 Pet. [39 U. S.] 334, and Boisdoré, 11 How. [52 U. S.] 63; third, where by concession parties were required by special regulations to levee and ditch on the river's front in Lower Louisiana. These were subsequent conditions, just as much as the introduction of a colony of hemp-growers, and the manufacture of cordage by Clamorgan; and yet no one has ever successfully maintained that a party having such concession could hold the land and obtain a perfect title, although he did not build the mill, nor occupy and cultivate, nor levee and ditch, founded on the assumption that performance was unnecessary. In all these cases it was held that performance was a condition precedent, and the real equity on which a favorable decree for a patent could be founded under the act of 1824. If Clamorgan's concession carries with it conditions similar in principle, it must abide by this settled rule of decision. This depends on the true meaning of his contract with the Spanish authorities. He agreed to establish a colony, by introducing a foreign population, and to grow hemp and manufacture cordage, to an amount so large as to make it a national object. By these promises he obtained a concession for more than half a million of arpens of land. A promise of performance was the sole ground on which the Spanish commandant made the concession; and actual performance was to be the consideration on which a complete title could issue. So far from complying, Clamorgan never took a single step after the agreement was made, and in 1809 sold out his claim on speculation for the paltry sum of $1,500. Under these circumstances, we are called on to decide in his favor, according to the principles of justice, this being the rule prescribed to us by the act of 1824 and the Spanish regulations. To hold that an individual should have decreed to him, or to his assignees, a domain of land more than equal to seven hundred square miles, for no better reason that that he had the ingenuity to induce a Spanish commandant to grant the concession founded on extravagant promises, not one of which was ever complied with, would shock all sense of justice. And such conclusion would be equally contrary to the policy pursued by Spain, which was to make grants for the purposes of settlement and inhabitation, and not to the end of mere speculation. We so held in Boisdoré's Case, 11 How. [52 U. S.] 96, and the principle applies even more strongly in this case than it did in that; as there something was done towards compliance, and here nothing has been attempted.

The remaining ground on which the complainants demand a confirmation is the following: "Because if the concession was upon conditions which should have been complied with in order to vest the estate as against Spain, whilst the conditions were practicable and might have been performed by the grantee, the estate vested without such performance, because the province was ceded by Spain before the time for

performance had expired, and because of the change of government, manners, &c., conse-·quent on that cession." That Clamorgan could take no step after the change of government, is not open to controversy. By the 14th section of the act of ·March 26, 1804 [2 Stat. 287], which establishes the territories of Orleans and Louisiana, Clamorgan was prevent-·ed from doing any further act in support of his title, had he been disposed to do so. He was positively prohibited from making settlements ·on the land, or making a survey of it, under the penalty of fine and imprisonment. But no advantage resulted from this provision to ·claimants, whose concessions ·carried with them conditions that had not then been complied with. The 1st section of the act of 1824, in conformity to which we are now exercising jurisdiction, limits the courts as to the validity of title and standing of the various claims, to the ·condition they held before the 10th of March, 1804. By the 3d article of the treaty of cession by which Louisiana was acquired, it was stipulated that the inhabitants of the ceded ·territory should be admitted ·as soon as possible and become citizens of the United States, and be maintained in the free enjoyment of their property in the mean time. But no time was provided by the treaty within which conditions appertaining to imperfect grants of land might be performed; this was left to the justice and discretion of our government; and in ·a due exercise of that discretion, the acts of 1804 and 1824 were passed, and to these acts of congress the 2d section of the act of 1824 commands us to conform. The treaty addressed it-·self to the political department; and up to the passing of the act of 1824, that department alone had power to perfect titles and administer equities to claimants. And when judicial cognizance was conferred on the courts of justice to determine ·questions of title between the government and individuals, the limits of that jurisdiction were prescribed, namely, that no act done by the Spanish authorities, or by an individual claimant, after the 3d day of March, 1804, should have any effect on the title, but that its validity should be determined according to its con-·dition at that date. All claims lying within the territory acquired by the treaty of 1803, which have been brought before the courts according to the acts of 1824 and 1844, have ·been compelled to abide by this test. Great numbers have been rejected because the conditions of occupation and cultivation had not ·been complied with before the restraining act of 1804 was passed, or before the 10th day of March, 1804. Nor have the claimants under ·Clamorgan more right to complain than others. His neglect extended through nearly eight years, during the existence of the Spanish government; whereas many similar claims have been rejected where the neglect was not half ·so long. If Clamorgan could come forward be-·cause of the prohibition, and be heard to excuse himself from performing the onerous conditions his contract imposed, so could every ·other claimant who had neither taken possession, nor in any manner complied with his contract, ·do the same; and on this assumption, concession issued by France or Spain would be ·without condition, and a simple grant of the land described in the paper. Its genuineness, and proof of identity of the land, would settle the question of title. No tribunal has ever accorded any credence to this claim. Two ·boards of commissioners have pronounced it invalid. The first in 1811, and the second in 1835; the latter on the ground that the conditions of the grant had not been complied with. By this decision it fell into the mass of public lands, according to the third section of the act of July 9, 1832 [4 Stat. 567], which declares that the lands contained in the second class (being that rejected) shall be subject to sale as other public lands. By the act of the 17th of June, 1844 [5 Stat. 676], another op-

portunity was afforded to apply to the district court for a confirmation. That court agreed with the board of commissioners, and again declared the claim invalid, because the conditions had not been complied with, and dismissed the petition; and with this decree we concur. Decree affirmed.